## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. _____**

```
----------------------------------------------------x
```

JS IP, LLC;

FONTAINEBLEAU FLORIDA
HOTEL, LLC;

FONTAINEBLEAU FLORIDA
TOWER 2, LLC; and

FONTAINEBLEAU FLORIDA
TOWER 3, LLC;

                 Plaintiffs,

     v.

LUXURY SUITES INTERNATIONAL,
LLC

                 Defendant

```
----------------------------------------------------x
```

## **COMPLAINT**

     Plaintiffs JS IP, LLC, Fontainebleau Florida Hotel, LLC, Fontainebleau Florida

Tower 2, LLC, and Fontainebleau Florida Tower 3, LLC, by and through their

undersigned counsel, for their complaint against Defendant Luxury Suites International,

LLC, hereby allege and state the following:

## **INTRODUCTION**

     1.    This action arises out of Defendant's unauthorized, bad faith use of the

FONTAINEBLEAU and FB Logo marks in order to deceive and defraud the public and

to harm Plaintiffs, as well as Defendant's knowing, intentional, and unjustified tortious

interference with Plaintiffs' contractual relationships with individual condominium units owners who contracted with Plaintiff FFH to be the exclusive agent for the management, rental, and administration of their units.  As a result of Defendant's wrongful and unlawful conduct, Plaintiffs have suffered, and will continue to suffer, damage to their business, reputation, and goodwill.

## PARTIES

2.      Plaintiff JS IP ("JS IP") is a limited liability company organized under the laws of the State of Delaware, and has its principal place of business at 19950 West Country Club Drive, 10th Floor, Aventura, Florida  33810.

3.      Plaintiff Fontainebleau Florida Hotel, LLC ("FFH") is a limited liability company organized under the laws of the State of Delaware, and has its principal place of business at 19950 West Country Club Drive, 10th Floor, Aventura, Florida 33810.

4.      Plaintiff Fontainebleau Florida Tower 2, LLC ("FFT 2") is a limited liability company organized under the laws of the State of Delaware, and has its principal place of business at 19950 West Country Club Drive, 10th Floor, Aventura, Florida 33810.

5.      Plaintiff Fontainebleau Florida Tower 3, LLC ("FFT 3") is a limited liability company organized under the laws of the State of Delaware, and has its principal place of business at 19950 West Country Club Drive, 10th Floor, Aventura, Florida 33810.

6.      The joinder of Plaintiffs JS IP, FFH, FFT 2, and FFT 3 is appropriate pursuant to Fed. R. Civ. P. 20 because Plaintiffs are jointly asserting a right to relief

arising out of the same series of transactions or occurrences, and because there are common questions of law or fact that will arise in this action.

7.      Upon information and belief, Defendant Luxury Suites International, LLC ("Defendant") is a limited liability company organized under the laws of the State of Nevada, with its principal place of business at 5115 S. Decatur Blvd, #200, Las Vegas, Nevada 89118.

## JURISDICTION AND VENUE

8.      This is a claim for damages and injunctive relief for trademark infringement, false designation of origin, unfair competition, and trademark dilution under the Lanham Act, 15 U.S.C. § 1051 et seq., trademark dilution under Fla. Stat. § 495.151, common law trademark infringement under Florida common law, and tortious interference with business relationships under Florida common law.

9.      The Court has subject matter jurisdiction over this action pursuant to the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338.  This court has pendant jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1338(b).

10.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant transacts business within this district and the acts complained of herein that have caused and are continuing to cause injury to Plaintiffs and are continuing to occur within this district.

### Plaintiffs' FONTAINEBLEAU and FB Logo Marks

11.      Plaintiff FFH operates the famous Fontainebleau Miami Beach resort in Miami, Florida.  The Fontainebleau Miami Beach, opened in 1954, is one of the most famous hotels in the United States, and was added to the National Register of Historic

Places in 2008.  In addition to over 1,500 guest rooms, Fontainebleau Miami Beach is also home to two towers containing 748 individually owned condominium units, many of which are rented out to the public through a rental program administered by Plaintiff FFH.

12.     JS IP owns the trademark rights in the mark FONTAINEBLEAU ("JS IP's FONTAINEBLEAU Mark" or "the FONTAINEBLEAU Mark"), and licenses it to FFH and its affiliates in connection with the management and operation of the Fontainebleau Miami Beach.

13.     JS IP owns numerous trademark and service mark registrations consisting of or comprising the FONTAINEBLEAU Mark, including the following:

| Mark | Reg. No. | Reg. Date | Goods and Services |
|---|---|---|---|
| FONTAINEBLEAU | 3,164,415 | 10/31/2006 | Real estate management, leasing and listing services in the field of residential home and condominium projects, country clubs, and recreational facilities<br><br>Real estate development and construction services, namely, planning, laying out, and construction of residential home and condominium projects, country clubs and recreational facilities. |
| FONTAINEBLEAU | 4,195,065 | 08/21/2012 | Pencils, paperweights, stationery<br><br>Coasters, not of paper and not being of table linen |
| FONTAINEBLEAU | 4,075,408 | 12/20/2011 | Beach towels |
| FONTAINEBLEAU | 4,119,072 | 03/27/2012 | Wearing apparel, namely, shirts, t-shirts, hats, caps, visors, sweatshirts, beach sandal |
| FONTAINEBLEAU | 4,321,353 | 04/16/2013 | Playing cards, gaming equipment, namely, poker; games and toys, namely toy banks, plush animals |

| FONTAINEBLEAU | 4,032,379 | 9/27/2011 | Wedding chapel services |
|---|---|---|---|
| FONTAINEBLEAU | 3,801,194 | 06/8/2010 | Postcards, posters, photographic prints, pens, letter openers, address books, calendars, photographic albums, paper napkins and coasters made of paper |
| FONTAINEBLEAU | 3,801,195 | 06/8/2010 | Drinking glasses, mugs, steins, cups, shot glasses, plates, serving trays not of precious metal, cookie jars; water bottles sold empty, insulated sleeve holders for beverage cans, thermal insulated containers for beverages, vases, bottle openers, cork screws, decorative boxes of crystal, earthenware, glass, hair brushes, hair combs and non-metal coin banks |
| FONTAINEBLEAU | 3,061,814 | 02/28/2006 | Hotel services |
| FONTAINEBLEAU | 3,633,197 | 06/2/2009 | Beauty salon services; health spa services, namely cosmetic body care services |
| FONTAINEBLEAU (Stylized) Fontainebleau | 4,392,681 | 08/27/2013 | Souvenir products, namely, coasters made of paper, paperweights, and greeting cards <br><br> Bags, namely, flights bags and tote bags. Mugs; beverage glassware |
| HOTEL FONTAINEBLEAU | 995,958 | 10/15/1974 | Hotel services |

These registrations are valid and subsisting and are evidence of JS IP and its licensees' exclusive right to use the FONTAINEBLEAU Mark in commerce in the United States.  Copies of the Certificates of Registration for these marks are attached as Exhibits 1-12.

14.     JS IP and its affiliates and licensees have used the FONTAINEBLEAU Mark in commerce in the United States since at least as early as 1954.

15.     JS IP's FONTAINEBLEAU Mark is inherently distinctive.

16.     As a result of the extensive advertising and promotion of JS IP's FONTAINEBLEAU Mark, the volume of sales of the goods and services offered in connection with the FONTAINEBLEAU Mark, the unsolicited media coverage of the FONTAINEBLEAU Mark, and other factors, the FONTAINEBLEAU Mark has achieved a secondary meaning among consumers in the United States identifying JS IP and its licensees, including FFH, as the sole source of goods and services offered under the FONTAINEBLEAU Mark.

17.     JS IP has developed substantial goodwill in the FONTAINEBLEAU Mark and it is a business asset of immense value to JS IP.

18.     JS IP has actively and consistently policed the FONTAINEBLEAU Mark, by demanding that third party users of similar marks cease and desist such use and by pursuing legal remedies where necessary.

19.     JS IP's FONTAINEBLEAU Mark has become famous among the general consuming public of the United States.

20.     JS IP is also the owner of rights in the following stylized logo mark consisting of the stylized lowercase letters "FB" (hereinafter the "FB Logo Mark"):



21.     JS IP also licenses the FB Logo Mark to FFH and its affiliates in connection with the operation and management of the Fontainebleau Miami Beach.

22.     JS IP owns numerous trademark and service mark registrations for the FB Logo Mark, including U.S. Reg. No. 3,677,324, which covers "hotels, resort hotels, resort services, namely, providing temporary lodging in the nature of a condominium hotel; bar and restaurant services."  A copy of the Certificate of Registration for this mark is attached as Exhibit 13.

23.     JS IP and its licensees and affiliates have used the FB Logo Mark in commerce in the United States since at least as early as September of 2008.

24.     JS IP's FB Logo Mark is inherently distinctive.

25.     As a result of the extensive advertising and promotion of JS IP's FB Logo Mark, the volume of sales of the goods and services offered in connection with the FB Logo Mark, the unsolicited media coverage of Plaintiff JS IP's FB Logo Mark, and other factors, the FB Logo Mark has achieved a secondary meaning among consumers in the United States identifying JS IP and its licensees, including FFH, as the sole source of services offered under the FB Logo Mark.

26.     JS IP has developed substantial goodwill in the FB Logo Mark and it is a business asset of immense value to JS IP.

27.      JS IP has actively and consistently policed the FB Logo Mark, by demanding that third party users of similar marks cease and desist such use and by pursuing legal remedies where necessary.

28.     JS IP's FB Logo Mark has also become famous among the general consuming public of the United States.

## Plaintiffs' Condominium Unit Rental Management Program

29.     In addition to the hotel, Fontainebleau Miami Beach is also home to two towers of individually owned condominium units.  These towers are known as the "Tresor" and "Sorrento" towers.  The structures and common areas of these towers are owned by Plaintiffs Fontainebleau Florida Tower 2, LLC and Fontainebleau Florida Tower 3, LLC, respectively.   There are 462 condominium units in the Tresor tower and 286 condominium units in the Sorrento tower.

30.     Although some of the owners of the condominium units permanently reside in the units, approximately 75% of the unit owners rent their units out to the public through a rental management program which is managed and administered exclusively by FFH.  FFH has been managing, administering, and renting the condominium units at the Fontainebleau Miami Beach since at least as early as February 2005.

31.     Individuals who purchase a condominium unit at the Fontainebleau Miami Beach are encouraged to join FFH's rental program, and the majority of unit owners choose to join the program.  These owners enter into a Unit Management Agreement ("UMA") with FFH and either FFT2 or FFT3, depending upon the location of their unit. A sample UMA, redacted for personal and confidential business information, is attached as Exhibit 14.

32.     Among other things, the UMA sets forth the terms and conditions under which the owner of the unit may rent the unit to third parties through FFH's unit rental management program.  The UMA typically has a fixed term of three years, which renews automatically unless the owner provides FFH and FFT or FFT3 with written notice of his or her intent not to renew at least 90 days prior to the expiration of the term.

33.     Paragraph 6 of the UMA specifies that FFH shall have the "sole and exclusive authority and right to rent, operate, manage, and administer the unit."  Ex. 14, ¶ 6.  It goes on to state that if the owner rents his or her unit in violation of the Agreement, the owner will be in breach and FFH will have the right to terminate the Agreement.

34.     The UMA explains in more detail FFH's exclusive right to rent the unit in Paragraph 11:

> Exclusive Right to Rent.  Owner grants [FFH] the exclusive right to rent the Unit during the Term (including Long-Term Rentals) and Owner may not, on its own or in concert with any other person, rent, lease, or exchange the Unit for consideration of any kind to any person during the Term.  If Owner Rents his/her unit in violation of this agreement, [FFH] is entitled to its management fee and rental revenue on any income derived by owner.

Ex. 14, ¶ 11.

35.     FFH's rental management program is a significant source of revenue for FFH and its affiliates.

**Defendant's Tortious and Infringing Activities**

36.     Upon information and belief, Defendant works with the owners of individually owned condominium units at upscale condo-hotel properties throughout the United States to rent these condominium units out to the public.

37.     Upon information and belief, Defendant has partnerships with several of the properties at which it rents condominium units, such as the Red Rock Casino Resort and the Palace Station in Las Vegas, and the owners of these properties have authorized Defendant to rent these units and to use the names, marks, and images of the properties in connection with advertising these units to the public.  However, Defendant has never had any partnership with the Fontainebleau Miami Beach.

9

38.     In October of 2012, Defendant began renting out one individually-owned condominium unit at the Fontainebleau Miami Beach.   Defendant has since added additional units to its rental program, including units whose owners were under contract with FFH to rent their units exclusively through FFH.  Defendant advertises these units on its web site and third-party web sites under the names "Fontainebleau by LSI," "LSI at Fontainebleau," and/or "Luxury Suites International at Fontainebleau Miami Beach."

39.     Defendant has directly contacted and is continuing to directly contact condominium unit owners at the Fontainebleau Miami Beach to rent their units through Defendant, which would be a breach of the owners' contracts with FFH.   In its contacts with the unit owners, Defendant is falsely stating and/or implying that it has a relationship with FFH and the Fontainebleau Miami Beach or that FFH has approved or authorized the unit owners to rent their units through Defendant instead of through FFH.

40.     Defendant has made numerous false statements and representations in its communications with the condominium unit owners.  For example, FFH obtained a copy of an e-mail that was sent by David Buonfiglio, Business Development and Owner Relations employee of Defendant, to a condo unit owner (Exhibit 15), in which Mr. Buonfiglio attempts to induce the owner to rent his or her unit through Defendant, which would be a breach of the Unit Management Agreement between the owner and FFH. Mr. Buonfiglio claims in the e-mail that:

> As per our agreement with Fontainebleau, there are No check in fees, …
> [*sic*] assessed to you as the owner."

In fact, there has never been any agreement or other relationship between Defendant and FFH or any other Fontainebleau-related entity.  Upon information and belief, Defendant has also falsely stated to condominium unit owners that it manages "hundreds" of

condominium units at the Fontainebleau Miami Beach, when in fact it currently manages only three units.

41.    Defendant is also using the FONTAINEBLEAU Mark and the FB Logo Mark to mislead unit owners into believing that FFH approves of the owners renting out their units through Defendant, when in fact the owners are breaching their agreements with FFH by doing so.

42.    Defendant provides these unit owners with a "Third Party Rental Agency Appointment Form," a sample of which is attached as Exhibit 16.  This form displays the FONTAINEBLEAU Mark and the FB Logo Mark, in addition to the official fax number of FFH's rental office:



FFH does not allow and has never allowed unit owners in its rental program to transfer the management of their units to a third party. This form is clearly intended to create the false impression that it is a form created by FFH for its unit owners to transfer the management of their units to a third party, when it fact it is a form created entirely by Defendant.

43.     Defendant has made these false statements and representations with the intent to mislead unit owners into believing that Defendant is associated with FFH, in order to induce these unit owners into unknowingly breaching their contracts with FFH by renting their units through Defendant.

44.     Defendant is also misleading the general public as to its association with the Fontainebleau Miami Beach, by using the FONTAINEBLEAU Mark to falsely suggest that consumers who book stays at Fontainebleau condominium units leased through Defendant are booking directly with the Fontainebleau Miami Beach.

45.     Defendant advertises the condominium units in its rental program via the Internet, through its own web site at www.luxurysuitesintl.com, its Facebook page at www.facebook.com/luxurysuitesintl, and through third-party travel sites such as travelzoo.com and getaroom.com.

46.     Defendant's web site claims that it has "exclusive partnerships" with the properties at which it rents units (Exhibit 17).  Although Defendant may have partnerships with some of the Las Vegas properties at which it offers rental units, it does not and has never had any partnership with the Fontainebleau Miami Beach.

47.     Defendant's Facebook page also falsely suggests to consumers that Defendant is associated with the Fontainebleau Miami Beach.  For example, a posting from October 18, 2012, refers to the Fontainebleau Miami Beach as "the newest addition to Luxury Suites International" (Exhibit 18).  Another post states "we cut the rates at Fontainebleau Miami Beach again" (Exhibit 19), without specifying that this promotion only referred to the single condominium unit managed by Defendant at that time, and not

the Fontainebleau's 1,500+ hotel rooms, or the other 757 condominium units at the Fontainebleau.

48.     Defendant has also listed its condominium units on third-party travel sites. These listings have intentionally sought to create the false impression that consumers who book stays through these sites are booking directly with the Fontainebleau Miami Beach.

49.     For example, in March of 2014, Defendant placed an advertisement on travelzoo.com for a "Miami Beach Suite" at the Fontainebleau Miami Beach (Exhibit 20).  The listing was under the name "Luxury Suites International at Fontainebleau Miami," with the same address (4441 Collins Avenue, Miami Beach, Florida) as the Fontainebleau Miami Beach.

50.     Many consumers who purchased a voucher through Defendant's listing on Travelzoo mistakenly believed they were purchasing directly from the Fontainebleau Miami Beach.  FFH's call center has received numerous calls from consumers who have sought to redeem their vouchers directly with Fontainebleau Miami Beach.  Many of these consumers have become angry and frustrated when they learned that FFH could not assist them with these bookings.

51.     Defendant also lists its condominium units on getaroom.com (Exhibit 21). As with the listing on Travelzoo, the getaroom.com listing identifies the property as "Luxury Suites International at Fontainebleau," and falsely states Defendant's address as 4441 Collins Avenue, Miami Beach, Florida.

52.     Moreover, the getaroom.com listing also contains excerpts from recent reviews of the Fontainebleau Miami Beach on tripadvisor.com, along with a link to the

official Tripadvisor page of the Fontainebleau Miami Beach.  These are reviews written by recent guests of the Fontainebleau Miami Beach hotel, not reviews by guests who have stayed in Defendant's condominium units.  These reviews are likely to cause consumers booking Defendant's units through getaroom.com to believe that they are booking directly with Fontainebleau Miami Beach, and that they will receive the same room type and level of service by booking through Defendant that they would by booking directly through the Fontainebleau Miami Beach web site or call center.

53.     Shortly after learning of Defendant's tortious and infringing conduct, FFH's General Counsel wrote to Defendant and demanded that Defendant immediately cease and desist its interference with FFH's contractual relationships and its infringement of the Fontainebleau marks and copyrights.

54.     Defendant's counsel responded via letter, stating that "[t]o the extent LSI has now been made aware of specific contracts, LSI will take special precaution and will certainly never encourage any breach" (Exhibit 22).  However, Defendant continued to directly target and solicit individual unit owners to breach their contracts with FFH.

55.     Upon learning of Defendant's continued interference, FFH referred the matter to its outside counsel, who wrote to Defendant's counsel advising Defendant that the continuing solicitation of FFH's unit owners constituted tortious interference with business relationships under Florida law, and that its unauthorized use of Plaintiffs' trademarks and copyrighted text constituted trademark and copyright infringement.

56.     Defendant's counsel responded with a letter claiming that Defendant had not used any copyrighted text or images belonging to Fontainebleau.  Defendant's

counsel also requested a copy of the Unit Management Agreement, which Plaintiff's counsel subsequently provided.

57. Shortly thereafter, FFH learned that in addition to continuing to knowingly solicit unit owners to breach their contracts, Defendant had been distributing flyers suggesting that Defendant was associated with the Fontainebleau Miami Beach (Exhibit 23). Among other things, these flyers contained language promoting live musical events at the Fontainebleau Miami Beach, which had been taken nearly word-for-word from the official Fontainebleau web site. Accordingly, FFH's counsel sent another letter demanding that Defendant cease its infringing activity and its interference with FFH's contractual relationships.

58. Defendant's counsel responded via a letter in which she stated that "LSI has contacted third parties and your concerns are remedied" (Exhibit 24). However, although Defendant made several minor changes to its own web site, it continued to directly solicit unit owners to break their contracts with FFH, and to misleadingly use the FONTAINEBLEAU Mark to suggest to unit owners and the general public that Defendant is associated with FFH, or that FFH has approved or authorized of Defendant's rental program.

59. In a subsequent telephone conversation between FFH's counsel and Defendant's counsel in March of 2014, Defendant's counsel reiterated that Defendant did not intend to stop directly contacting condominium unit owners under contract with FFH and attempting to induce them to breach their Unit Management Agreements with FFH.

**COUNT I**
**TRADEMARK INFRINGEMENT**
**UNDER THE LANHAM ACT, 15 U.S.C. § 1114**

60.     Plaintiffs repeat and re-allege paragraphs 1 through 59 herein.

61.     Plaintiff JS IP is the owner of U.S. Reg. No. 3,164,415 for the FONTAINEBLEAU Mark in connection with "real estate management, leasing and listing services in the field of residential home and condominium projects."

62.     Plaintiff JS IP is also the owner of U.S. Reg. No. 3,677,324 for the FB Logo Mark, which covers "hotels, resort hotels, resort services, namely, providing temporary lodging in the nature of a condominium hotel; bar and restaurant services."

63.     Defendant has used the FONTAINEBLEAU Mark and the FB Logo Mark in connection with real estate management, leasing, and listing services in the field of condominiums in interstate commerce, and is advertising and promoting to the general public its services in interstate commerce in connection with the aforesaid marks, which are identical to Plaintiff JS IP's FONTAINEBLEAU and FB Logo Marks.

64.     The condominium management, leasing, and listing services offered by Defendant under the FONTAINEBLEAU Mark are identical or virtually identical to the services offered by Plaintiff JS IP under its FONTAINEBLEAU Mark and its FB Logo Mark, and are marketed and sold through the same channels of trade.

65.     The consumers who book rentals of condominium units through Defendant are highly likely to believe that Defendant's services are offered by, licensed by, approved by, or otherwise associated with Plaintiffs.

66.     As a direct consequence of Defendant's actions, consumers and the public are likely to be, and have been, deceived or confused as to the source, origin, sponsorship and/or endorsement of Defendant's services and their relationship to Plaintiffs.

67.     Upon information and belief, Defendant's purpose in using the FONTAINEBLEAU Mark and the FB Logo Mark was and is to deceive, mislead and confuse customers and the public into believing that Plaintiffs are the source of Defendant's services, or that the services offered by Defendant are sponsored by, licensed by, or associated with Plaintiffs, so as to trade on the substantial fame, reputation and goodwill enjoyed by Plaintiffs.

68.     Defendant's unlawful acts constitute trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114.

69.     By reason of Defendant's unlawful acts and practices in violation of the Lanham Act, Plaintiffs have suffered, and will continue to suffer damage to their business, reputation and goodwill, for which Plaintiffs are entitled to injunctive relief and monetary damages.

70.     Because Defendant's actions have been committed with intent to cause harm to Plaintiffs and to confuse and deceive the public, Plaintiffs are entitled to Defendant's profits, treble Plaintiffs' actual damages, and an award of costs.  In addition, as Defendant's use of the FONTAINEBLEAU Mark and the FB Logo Mark constitutes intentional use of a "counterfeit mark" pursuant to 15 U.S.C. § 1116(d), Plaintiffs are entitled to statutory damages of not less than $1,000 or more than $200,000 per counterfeit mark as set forth in 15 U.S.C. §1117(a).  Finally, as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), Plaintiffs are entitled to an award of attorneys' fees.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN AND**
**UNFAIR COMPETITION UNDER THE LANHAM ACT, 15 U.S.C. § 1125**

71.     Plaintiffs repeat and re-allege paragraphs 1 through 59 herein.

72.     Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Mark are widely
recognized by consumers throughout the United States.

73.     Defendant is using the FONTAINEBLEAU Mark and the FB Logo Mark
to advertise and sell its real estate management, listing, and rental services in interstate
commerce.

74.     The real estate management, listing, and rental services offered by
Defendant under the FONTAINEBLEAU Mark and the FB Logo Mark are identical or
closely related to the services offered by Plaintiffs under Plaintiff JS IP's
FONTAINEBLEAU Mark and FB Logo Mark.

75.     The real estate management, listing, and rental services offered by
Defendant under the FONTAINEBLEAU Mark and the FB Logo Mark are marketed and
sold through the same channels of trade as the real estate management, listing, and rental
services offered by Plaintiffs under JS IP's FONTAINEBLEAU Mark and FB Logo
Mark.

76.     Defendant's unauthorized use of the FONTAINEBLEAU Mark and the
FB Logo Mark is likely to cause consumers and the public to erroneously believe that
Defendant's real estate management, listing, and rental services are offered by, licensed
by, approved by, or otherwise associated by Plaintiffs.

77. Defendant has made numerous representations to consumers and the general public which state, suggest, and imply that Defendant is associated with Plaintiffs, or that Defendant's services are provided by or authorized by Plaintiffs.

78. As a direct consequence of Defendant's actions, consumers and the public are likely to be, and have been, deceived or confused as to the source, origin, sponsorship and/or endorsement of Defendant's services and their relationship to Plaintiffs.

79. Upon information and belief, Defendant's purpose in using the FONTAINEBLEAU Mark and the FB Logo Mark is to deceive, mislead and confuse customers and the public into believing that Plaintiffs are the source of Defendant's services, or that the services offered by Defendant are sponsored by, licensed by, or associated with Plaintiffs, so as to trade on the substantial fame, reputation and goodwill enjoyed by Plaintiffs.

80. Defendant's unlawful acts constitute common law trademark infringement, unfair competition, and false representation as to source in violation of the Lanham Act, 15 U.S.C. § 1125(a).

81. By reason of Defendant's unlawful acts and practices in violation of the Lanham Act, Plaintiffs have suffered, and will continue to suffer damage to their business, reputation and goodwill, for which Plaintiffs are entitled to injunctive relief and monetary damages.

82. Because Defendant's actions have been committed with intent to cause harm to Plaintiffs and to confuse and deceive the public, Plaintiffs are entitled to Defendant's profits, treble Plaintiffs' actual damages, and an award of costs. In addition,

as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), Plaintiffs are entitled to an award of attorneys' fees.

## COUNT III
## DILUTION UNDER THE LANHAM ACT, 15 U.S.C. § 1125(c)

83.     Plaintiffs repeat and re-allege paragraphs 1 through 59 herein.

84.     As a result of the nationwide advertising and promotion of Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Mark, the extensive unsolicited media coverage of Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Mark, and other factors, Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Mark have become famous among the general public of the United States.

85.     Plaintiff JS IP's FONTAINEBLEAU Mark became famous before Defendant's first use in commerce of the FONTAINEBLEAU Mark, and Plaintiff JS IP's FB Logo Mark became famous before Defendant's first use in commerce of the FB Logo Mark.

86.     Defendant uses the FONTAINEBELAU Mark and the FB Logo Mark in connection with real estate management, listing, and rental services which are offered and provided in the United States.

87.     Upon information and belief, Defendant's use of the FONTAINEBLEAU Mark and the FB Logo Mark has been intentional and in bad faith, namely, with the intent to trade on Plaintiffs' reputation and with the intent to cause dilution of Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Mark.

88.     Defendant's use of the FONTAINEBLEAU Mark and FB Logo Mark has caused and is likely to continue to cause dilution of the distinctive quality of Plaintiff JS

IP's FONTANIEBLEAU Mark and FB Logo Mark in violation of the Lanham Act, 15 U.S.C. § 1125(c).

89.     By reason of Defendant's unlawful acts and practices, Plaintiffs have suffered and will continue to suffer damage to their business, reputation and goodwill, for which Plaintiffs are entitled to injunctive relief and monetary damages.

90.     Because Defendant's actions have been committed with intent to cause harm to Plaintiffs and to confuse and deceive the public, Plaintiffs are entitled to Defendant's profits, treble Plaintiffs' actual damages, and an award of costs.  In addition, as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), Plaintiffs are entitled to an award of attorneys' fees.

**COUNT IV**
**TRADEMARK DILUTION UNDER FLA. STAT. § 495.151**

91.     Plaintiffs repeat and re-allege paragraphs 1 through 59 herein.

92.     Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Mark are highly distinctive and famous in the state of Florida.

93.     Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Mark both became highly distinctive and famous in Florida prior to any use by Defendant of the FONTAINEBLEAU Mark or the FB Logo Mark.

94.     Defendant has used Plaintiff JS IP's FONTAINEBLEAU Mark and FB Logo Marks in a manner that has lessened the capacity of the marks to distinguish Plaintiffs' goods and services, or is likely to lessen the capacity of the marks to distinguish Plaintiffs' goods and services.

95.     Defendant's use of the FONTAINEBLEAU Mark and the FB Logo Mark constitutes trademark dilution in violation of Fla. Stat. §495.151.

96.     By reason of Defendants' unlawful acts and practices, Plaintiffs have suffered, and will continue to suffer damage to their business, reputation and goodwill, for which Plaintiff is entitled to injunctive relief.

**COUNT V**
**COMMON LAW TRADEMARK INFRINGEMENT UNDER FLORIDA LAW**

97.     Plaintiffs repeat and re-allege paragraphs 1 through 59 herein.

98.     Plaintiff JS IP's FONTAINEBLEAU and FB Logo Marks are highly distinctive in the state of Florida.

99.     Plaintiff JS IP's FONTAINEBLEAU and FB Logo Marks became highly distinctive in the state of Florida prior to any use by Defendant of these marks.

100.    Defendant has used the FONTAINEBLEAU Mark and the FB Logo Mark to market and sell real estate management, listing, and rental services in the State of Florida.

101.    The real estate management, listing, and rental services offered by Defendant under the FONTAINEBLEAU and FB Logo Marks are identical or closely related to the services offered by Plaintiffs under Plaintiff JS IP's FONTAINEBLEAU and FB Logo Marks.

102     Defendant's use of the FONTAINEBLEAU and FB Logo Marks is likely to confuse consumers in the State of Florida into believing that Defendant's services are offered by, sponsored by, licensed by, or otherwise associated with Plaintiffs.

103.    Defendant's use of the FONTAINEBLEAU Mark and the FB Logo Mark constitutes trademark infringement in violation of Florida common law.

104.    Defendant's actions are willful, wanton, and in reckless disregard for the rights of Plaintiffs.

22

105.    By reason of Defendants' unlawful acts and practices, Plaintiffs have suffered, and will continue to suffer damage to their business, reputation and goodwill, for which Plaintiffs are entitled to injunctive relief and monetary damages.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
**UNDER FLORIDA LAW**

106.    Plaintiffs repeat and re-allege paragraphs 1 through 59 herein.

107.    Plaintiffs FFT2, FFT3, and FFH have existing contractual relationships with hundreds of individual condominium unit owners.

108.    Plaintiffs' contracts with the condominium unit owners, the Unit Management Agreements, clearly state that FFH shall have the exclusive right and authority to rent, manage, operate, and administer the condominium units owned by these owners.

109.    Defendant has full knowledge of the contracts between Plaintiffs and the condominium unit owners.

110.    Defendant is knowingly, intentionally, and unjustifiably soliciting and inducing these unit owners to breach their contracts with Plaintiffs by renting their units through LSI and by giving LSI the authority to manage and administer the units, despite the provisions in the Unit Management Agreements stating that FFH shall have the sole authority to rent and administer the units and that any rental of the units through other parties shall be a breach of the Agreement.

111.    In its contacts with the unit owners who have executed and are bound by Unit Management Agreements, Defendant has made and continues to make false or misleading representations suggesting that Defendant is associated with Plaintiffs, that

Defendant has an agreement with Plaintiffs, that Defendant's services are offered by or authorized by Plaintiffs, or that Plaintiffs approve of the unit owners transferring the management of their units to an outside party.

112.    Upon information and belief, several condominium unit owners under contract with Plaintiffs have breached these contracts as a direct result of Defendant's improper and unjustified solicitations and contacts, including false or misleading representations.

113.    Plaintiffs have suffered and will continue to suffer significant harm as a result of Defendant's interference with Plaintiffs' contractual relationships with the unit owners.

114.    By reason of Defendant's unlawful acts and practices, Plaintiffs have suffered, and will continue to suffer damage to their business, reputation and goodwill, for which Plaintiffs are entitled to injunctive relief and monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and grant the following relief:

A.      An injunction enjoining Defendant, and anyone operating in concert with Defendant, from using the FONTAINEBLEAU Mark or the FB Logo Mark, or any mark, domain name, trade name or source identifier, which comprises or is confusingly similar to the FONTAINEBLEAU Mark or the FB Logo Mark;

B.      An injunction enjoining Defendant, and anyone operating in concert with Defendant, from selling, advertising or promoting any services that infringe upon the FONTAINEBLEAU Mark and the FB Logo Mark;

C.      An injunction enjoining Defendant from stating, suggesting, implying, or otherwise representing that Defendant's services are offered by, provided by, approved by, or authorized by Plaintiffs;

D.      An injunction enjoining Defendant from interfering with Plaintiffs' contractual relationships with the owners of condominium units at the Fontainebleau Miami Beach, including but not limited to directly contacting the condominium unit owners and soliciting them to transfer the management of their units to Defendant;

E      That Plaintiffs be awarded their actual damages and lost profits in an amount to be proven at trial;

F.      That Defendant be required to account for any profits attributable to its infringing and tortious acts;

G.      That Plaintiffs be awarded the greater of three times Defendant's profits and three times any damages sustained by Plaintiffs, and prejudgment interest;

H.      That punitive damages be awarded to Plaintiffs;

I.      That all products, labels, signs, prints, packages, brochures, and advertising and promotional materials in the possession of Defendant bearing the FONTAINEBLEAU Mark and/or the FB Logo Mark, or any word, term, name, symbol, device, combination thereof, designation, description, or representation that is found in violation of the Lanham Act, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up by Defendant and destroyed;

J.      That pursuant to 15 U.S.C. § 1116, Defendant file and serve a report under oath within thirty days of the issuance of injunctive relief indicating the manner in which

it has complied with any injunctive relief ordered by the Court;

      K.    That Plaintiffs be awarded their reasonable attorney fees in prosecuting

this action; and

      L.    That Plaintiffs be granted such other and further relief which the Court

deems just and proper.

## DEMAND FOR JURY TRIAL

    Plaintiffs demand a jury trial as to all issues so triable.

Dated:  April 9, 2014

                         Respectfully submitted,

                         **BUCHANAN INGERSOLL & ROONEY PC**
                         1737 King Street, Suite 500
                         Alexandria, Virginia 22314-2756
                         703-836-6620
                         703-836-2021 (fax)

                   BY   /s Bryce J. Maynard
                       Bassam N. Ibrahim
                       bassam.ibrahim@bipc.com
                       Bryce J. Maynard
                       bryce.maynard@bipc.com

                         **COLSON HICKS EIDSON, P.A.**
                         255 Alhambra Circle, Penthouse
                         Coral Gables, Florida 33134
                         Tel: (305) 476-7400
                         Fax: (305 476-7444

                   BY   /s Roberto Martínez
                       Roberto Martínez
                       Fla. Bar No. 305596
                       bob@colson.com
                       Stephanie A. Casey
                       Fla. Bar. No. 97483
                       scasey@colson.com

                       *Attorneys for Plaintiffs*